In the case against Coleman, the opinion of the Court was delivered by
Withers, J.
The grounds of appeal are numerous, and have all received the consideration of this Court. Most of them, it is hoped, may be disposed of in a satisfactory manner, without any extended course of observation.
*134 The defendant claims to have become exempt from all liability to the company.
The first ground for this is, that a route differing from that which he designated, upon subscribing, has been fixed by the company. These are the words, “ and after the selection of the route, any stockholder, who may be dissatisfied with the route selected, shall have the right to withdraw his subscription,” &c. “provided such stockholder shall have designated, at the time of subscribing, the route which he desires to be selected for the location of the road.” (11 Stat. 409.)
It is enough to say that there is no evidence whatever that the defendant, Coleman, made any such qualification at the time of his subscription, in any form; and the ruling on the circuit, that such a qualification should appear in the act or instrument of subscription, was pertinent only to another case, (that of Choice) tried at the same time, and which will be adverted to hereafter.
It is next insisted, that a majority of the company consisted, in legal contemplation, only of a majority of those who had subscribed unconditionally; whereas, subscribers in Lexington, Laurens, Abbeville, Anderson and Fairfield, were allowed to vote upon the question of the route, notwithstanding they had qualified their subscriptions by designating a particular route as the condition of them, and thus had preserved to themselves the right of withdrawal. In the charter of December, 1845, no provision, such as is above extracted, appears; all subscriptions therein contemplated were absolute. That charter was forfeited by a failure to secure the requisite amount of stock. It was revived in December, 1846, and a competition was then intended to be excited between sections of the State on the west and east side of Saluda river, intermediate between Newberry Court House and Greenville, that is to say, between the people of Abbeville and Anderson, on the one part, and those of Laurens on the other, as well as to stir up interest in other sections of country, and in Charleston and Columbia. For not only was a subscriber authorized, by the latter Act, to designate the route he *135 preferred, but that route itself was left to be the subject of competition. Ill the original charter, that of 1845, it was fixed to be from Columbia to Greenville, passing through the villages of Newberry and Laurens ; whereas, by the reviving and amending Act of 1846, the company were allowed to “ cause surveys to be made of the different routes from any part of the South Carolina Rail Road to Newberry village, and thence to Green-ville village, and may be allowed to select such route as a majority of the stockholders shall deem most advisable.” (11 Stat. 409).
Thus it appears that the route fixed by charter was only from some point on the South Carolina Rail Road to Newberry, and thence to Greenville. A majority of stockholders were to determine all else touching the route.
The argument is, that no one was a stockholder to vote on the question of the route, except him who had subscribed unconditionally. Then suppose every one had subscribed conditionally as to the route, how would the company ever have been organized?; or, if the idea could be advanced that such subscribers could vote upon the organization of the company, that they might be stockholders quoad hoc, yet, when the matter of the route arose, must retire because they were not stockholders, — we should have a state of things amounting to the ridiculous and absurd.
It seems obvious that the defendant himself insisted on a far more reasonable position, when he endeavored to rouse the people of Abbeville district to a liberal subscription by the very inducement that they could control the-.location of the route to their own advantage; although he now complains that they acted upon his suggestion. In his letter of August, 1847, referred to in the report, he distinctly contemplated that they should vote upon the route. It might be added, that at the moment we hear this objection from the defendant to the conditional subscriber, we also hear him urging that he occupied the same condition himself; and yet he became a director of the company^ and voted by proxy upon the question of the route. The jury *136 were well warranted in finding, as they did, that it was no fraud on Coleman that such subscribers participated in settling the route ; indeed, it appears, that if every one of such subscribers had been excluded, there would still have been left, of unconditional subscribers, a majority in favor of the route selected, being those from Charleston, Columbia and Newberry.
The extracts before made from the charter of 1845, and the amendment of it in 1846, must dispose of another ground taken for the appeal, to wit: — that the company were bound by the limitations of their charter, “ to the most practicable route from Newberry Court House through Laurens to Greenville.” Surely it cannot be believed that the selection “ of such route as the majority of the stockholders shall deem most advisable,” from Newberry village to Greenville village, imposes the obligation to fix the route absolutely through Laurens. Still less can this be believed, when the very object of the amendment of the charter was to emancipate the company from the necessity to traverse Laurens district, and open to them a very wide discretion in fixing the route between the villages of Newberry and Greenville, the sole ascertained points.
Yet the defendant insists upon another view which presents a question of more gravity. The route resolved upon, and of which he complains, was this, to wit: — from Newberry Court House through Abbeville, and by Anderson Court House to Greenville. When this was resolved upon, on the 20th November, 1847, the representatives of the Greenville stockholders withdrew, and announced that the Greenville subscribers were no longer members of the corporation — and, afterwards, the money they had paid was demanded back, but it was refused by the company, which, in May, 1848, decided, unanimously, that the Greenville stockholders should not be permitted to withdraw. In December, previous, they had procured from the Legislature a separate charter to construct a road, on the condition that they should release the company from the obligation to construct one to Greenville. From what has been said, it will follow that, up to this period, we do not hold the defendant *137 absolved as a corporator; that is to say, in fixing the route already described, we do not think the company violated the charter, and, therefore, violated no contract with defendant. The surveys from Anderson Court House to Greenville indicated difficulties as to grade and cost, and an idea was entertained that some better route could be ascertained to Greenville, than from the village . of Anderson direct, as well as a hope that some adjustment could be effected with the subscribers at Greenville, whereby they would become reconciled. Such better route was found from Brown’s, a point nine miles short of Anderson Court House, to Greenville, which attracted the attention of the company, and many of the subscribers of Greenville. Meantime, citizens of Abbeville had subscribed $75,000 to build a prong from the main trunk to the Court House of that district, and desired the company to undertake it. The company procured an Act of the Legislature, at the December session of 1849, (11 Stat. 575,) empowering it to construct the branch to Abbeville, and receive the money subscribed, or to be subscribed, for that purpose, to increase their stock, from time to time, if found necessary,— to establish the line of the road to be “ from Columbia to Newberry Court House, thence through Abbeville district to Anderson Court House, (including the branch to Abbeville Court House) and from, at, or near Dr. Brown’s, in Anderson, district, to Greenville Court House” — .and $75,000, in stock of the State in the South Carolina Rail Road Company, to be taken at par, was granted to the Greenville and Columbia Rail Road Company by the Legislature, “ for the purpose of aiding in constructing the branch road to Abbeville Court House, and in completing the road to Greenville.” Before the passing of this Act, overtures were received by the company of stock from Greenville and from North Carolina, in all amounting to $188,000, and the same was tendered, if that company would undertake the construction of the road from Brown’s. Neither in this transaction, nor any otherwise, does it appear that the defendant has participated in the affairs of the company,, since the location of the line of road, at Newberry, in November, 1847. The com *138 pany is now engaged, however, in constructing their road according to the route fixed by the Act of 1849.
The further question raised by the defendant is, whether the matters, hereinbefore first recited, do not constitute such a change in the objects and operation of the corporation, such additional undertaking and burthen, as to change the contract into which he entered; and he opposes to the amending Act of the Legislature the provision of the Constitution of the United States, prohibiting a State from passing any law impairing the obligation of a contract.
This question well deserves consideration; and it would be agreeable to treat it more at large than our opportunity will now permit.
It is agreed that a charter is a contract, and is under the protection of that clause of the Federal Constitution to which allusion has been made. It vests rights and creates valuable interests, and may not be repealed, enervated, or essentially changed; yet common- reason would seem to suggest, that when the end is a great public enterprize, such as the construction of a Rail Road, the power that granted the franchise might, upon application by the controlling authority of the corporation, deal with the original structure that created it, in a manner that would be inadmissible touching a contract between two persons, or with even a grant for a tract of land to an individual. It was probably such a thought as this which led Lord Brougham (in Ware vs. The Grand Junction Water Works Company, 2 Rus. & Mylne, 470,) to observe, as follows “ It was said that if corporate bodies of this description are allowed to make such an application” (meaning an application to Parliament for an alteration and extension of its powers) "those who rely on that constitution are deceived, because they come in on the faith and footing of its being a partnership of a certain kind, and now tt is sought to be materially varied. But are not a man’s eyes open to the fate that attends him when he enters into a body of dhis kind 1 Does he not know that he is liable to this contingency, and either that the company ought to have the power of *139 obtaining an alteration in the constitution, or that he ought to come in as a member of it under certain conditions and restrictions?” We do not, however, intend to rule any thing on the subject, nor to say that a member of a corporation may not be absolved by changes in the charter procured without his consent by a majority of his fellows. Nevertheless, it would appear reasonable to say, that if the corporation did acts to which a member did not object, either because he was supine or because he would not attend when he might and should have done so, it would not be harsh to hold hito estopped from disputing his acquiescence, especially when, liabilities, duties and burthens might accrue thereby upon the corporation.
The considerations already-expressed have conducted us to the conclusion that there is no cause of just objection to that location of the road that carried it through Abbeville district by Anderson Court House to Greenville. It follows, that the line might deflect before it reached Anderson Court House and be liable to less objection. The road does thus go from a point on the South Carolina Rail Road to Newberry Court House, and thence to Greenville, by a route established by a majority of the stockholders, which is conformable to the provision of the amended charter on that subject, under which Coleman subscribed. It can be no objection that a divergence at Brown’s has been resolved on, though it be a departure from the original scheme, of proceeding direct from Anderson Court House; nor is it matter of just complaint that this is fixed and sanctioned by the Act of Assembly of 1849. Then the matter is reduced to this: Is the undertaking to build a branch of eleven miles to Abbeville Court House such a violation of contract with the defendant, such a departure from the substantial provisions of the charter, as to absolve him from all obligation to pay the money he promised on subscribing?
We cannot so regard it. For this particular work, $75,000 were supplied by individual subscribers. Partiy to aid this structure, $75,000 more, in the form of stock in the South Carolina Rail Road, were granted to thé company who are plaintiffs *140 here, by the State. Now it cannot be assumed, that a work so inconsiderable, when compared with the whole enterprize, and attended by the circumstances stated, of private contribution and public bounty, must prove an additional and distinct burthen upon the stockholders. Whether a degree of variation . from the original scheme of a line of Rail Road may be a clear benefit, or an equivocal advantage, or an unmitigated additional burthen, may not be a complete answer to the language held by a contracting party, — non licec in fcodera veni — yet such a consideration must have weight in some cases that must arise, and has forced itself upon the attention of minds that have been drawn to this question. For example, in the case cited for the defendant, The Hartford and New Haven Rail Road Company vs. Crosswell, (5 Hill, N. Y. 383,) it was said by Nelson, C. J. “ I do not deny that alterations may be made in the charter by the procurement of the company without changing the contract so essentially as to absolve the subscriber. Such would be the case, perhaps, in mere formal amendments, or those which are clearly enough beneficial, or at least not prejudicial to his interests. A modification of a grant may frequently be advisable, if not necessary, in order to facilitate the execution of the very object for which the company was originally established; and I admit there are intrinsic difficulties in the way of laying down any general rules by which to distinguish between the two kinds of cases., Each must depend upon its own circumstances, and be disposed of with a due regard to the inviolability belonging to all private contracts.” Similar views have been expressed by the Courts of Pennsylvania, as may be seen in 2 Watts & Surg. App. 160; and 10 Watts, 367.
We cannot trace the similitude between this case and that of The Hartford and New Haven Rail Road Company vs. Crosswell. In that case, a company chartered to make a Rail Road from Hartford to New Haven, procured and accepted an amendment, empowering them to lay out $200,000 of additional stock, in the purchase and employment of Steam Boats in connexion *141 with their Rail Road. The subscriber was protected from being driven into this new and foreign enterprize.
In the case of Natersch vs. Irving and others, (to be found in Gow on Part. App. 398) Lord Eldon restrained, by injunction, the Alliance British & Foreign Life and Fire Insurance Company, at the instance of the plaintiff, a member, from adding to their business, that of taking marine risques. So in Cunliff vs. The Manchester & Bolton Canal Company, (2 Rus. & Mylne, 470, note,) the corporation were restrained by the vice Chancellor, from affixing their seal to a petition to Parliament for an Act to convert a portion of the canal into a rail way, and from applying any of the corporate funds to that object. A case of like import may be found in the same book, Ware vs. The Grand Junction Water Works Company, where Lord Brougham declined to restrain the company from petitioning Parliament for a change in their operations, and left the complaining member to appear before that High Court and uige his rights; and he also declined to determine whether the change contemplated affected the inviolability of the contract; and restrained the execution of new operations, in the mean time, in order that Parliament might intervene. He dreaded opening the doors of Chancery to litigation of that kind, while he considered Parliament the all sufficient and appropriate tribunal for such contests between a member and a majority of his fellows. We-may not say the like here; for the constitutional guaranty of the inviolability of contracts shuts out the power of the Legislature as completely as that of the Court, from all interference with the obligation of any contract. But so palpable was the departure from the substance of the contract, in each of the cases just referred to, compared with any such thing to be extracted from the one now before us, that we can derive no guide from them.
When we consider the magnitude of the enterprize undertaken by the Greenville and Columbia Rail Road Company— the length of their line — the impossibility of foreseeing, at the outset, the best location as developed by future minute explora *142 tion — the necessity, in which they found themselves at the beginning, to stir up competition between different sections of country — the active agency of defendant in this particular, and touching Abbeville interests especially' — when we advert to the further considerations, that there is no certainty the eleven miles of road to Abbeville Court House will abstract a dollar from the original funds of the corporation — or that it will operate otherwise than as a mere incidental feeder to the main track, constructed by funds superadded to those before in the exchequer of the Company — that the defendant entered into a company with a discretion so large as this, (vide sec. 26 of the charter of 1845), to wit: — “ That the said company may unite with, and become a part of, the South Carolina Rail Road Company, if the two companies shall agree upon terms of amalgamation, and all the privileges granted by this Act shall, in' that event, be assigned to and become privileges of the said South Carolina Rail Road Company” — we think we should not be warranted in holding, that so inconsiderable a matter as the prong to Abbe-ville Court House, under the circumstances which appear in connection with it, shall not be accounted germain to the line of road from Columbia to Greenville, but shall work so great a consequence as to absolve every subscriber who has not specifically approved it from all obligation to pay his subscription.
We thus attain the conclusion that the motion of the defendant, Coleman, be dismissed.
In the case of Choice, the opinion of the Court was also delivered by.
Withers, J.
This case has been heard in connection with that of the same plaintiffs vs. John T. Coleman, and the same positions have been assumed for this defendant. So far, what has been said in Coleman’s case, will apply here.
But this defendant contends for the benefit of other positions, to wit: — (1) That he instructed his agent, John T. Coleman, to subscribe on the condition that the road should be located through Laurens; (2) that evidence ought to have been received *143 but was excluded to shew that he made the first payment, accompanied with the condition, that the money was not to be paid over to the company, unless the road should be located through Laurens, and failing that, it was to be refunded to him, — and (3) that R. B. Duncan, and not Coleman, entered his name in the book for subscriptions.
As to the last ground, it is sufficient to observe that Duncan and Coleman were two of three commissioners appointed to open the book for subscriptions; that Duncan entered all the names of subscribers and made all other requisite entries, as a clerk of the commissioners; and all these entries, including those affecting this defendant, were certified by the three commissioners, including Coleman, who was Choice’s agent to subscribe.
If any thing else were necessary to settle this point, it will be found in the fact that Choice joined in proxies, as a stockholder, and thus voted, on more than one important occasion. He, therefore, stands committed as a subscriber, not only by authority previously delegated, but also hy subsequent ratification.
The other two grounds may be considered together.
There is little doubt that the opinion very generally prevailed among the Greenville stockholders that the route of the road should be through Laurens. It was so fixed at first — but that matter was deliberately left open, in fact, a formed purpose was entertained (as the evidence shews) to give Laurens the “ go by.” The master purpose of the Greenville subscribers certainly was to procure a road to the village-of that district, by some route or other; this is placed beyond question, as well by the amending Act of 1846, as by other clear evidence. Now we have seen that the right of a subscriber to withdraw by reason of dissatisfaction with the line selected for the road, was put on the ground that he “ shall have designated, at the time of subscribing, the route which he desires to be selected for the location of the road.”
What manner of designation is here required 1 The time is clear, to wit: — when the subscription was made; and the very day of it was directed to be inserted by the commissioners. *144 Transcripts of the books opened elsewhere, were to be forwarded to the commissioners at Greenville — “containing a list of the subscribers, with such designations as are contained in the subscription books” — and they were to call the subscribers together for the purpose of organizing the company. We cannot doubt that the preference of a particular route should have appeared in the book of subscription. This was the view actually adopted at Laurens, Abbeville, Anderson, and elsewhere. How, otherwise, could the subscribers, when they came together, know each other as to an essential characteristic ? That a condition, so important as this, should rest in a private communication by principal to agent, not appearing on the face of a written power of attorney, or rest in a verbal communication to a commissioner, or to the whole body, is too clearly repugnant to the necessary ends which we must impute to the provision of the law to be admitted for a moment. If we needed illustration, we might find it abundantly under that principle of agency which recognizes a distinction between a power vested in’ an agent and instructions given to him as to its exercise. In such cases, a power is actually and legally vested in the agent, and enures to the protection of the person who deals with him to the full extent of it, and the instructions are not in diminution of the power, but are personal directions to guide its exercise. The question of damage or infidelity must remain between principal and agent only.
It results, therefore, that in the case of Choice also, the motion must bo refused; and it is ordered accordingly.
Evans, Wardlaw and Frost, JJ. concurred in both cases.
O’Neall and Wi-iitner, JJ. as President and Director of the company, did not hear the cases and gave no opinion.

Motions refused.